UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

ERIC HOSKINS,

    Defendant.
                                        /

No. CR 06-00190 MHP

**MEMORANDUM & ORDER**
**Re: Motion to Suppress Evidence**

On February 22, 2006 Inspector Michael Hamilton of the San Francisco Police Department ("SFPD") filed a complaint against defendant Eric Hoskins for knowingly and intentionally possessing a firearm in violation of 18 U.S.C. section 922(g)(1), and defendant was indicted on March 23, 2006. On May 30, 2006 defendant filed a motion to suppress all use of firearm evidence obtained from the investigatory stop and his subsequent arrest on February 3, 2005, claiming that it was obtained in violation of defendant's Fourth Amendment rights. On July 19, 2006 this court held an evidentiary hearing to establish the facts and circumstances leading up to the investigatory stop and subsequent arrest of defendant. Having considered the parties' testimony, arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

SUMMARY OF FACTS

The following factual summary derives from the police report to the extent referenced in the testimony, the affidavits submitted in connection with the motion to suppress, and the witnesses' testimony at the evidentiary hearing.

1    On the evening of February 3, 2006 Sergeant John C. Greenwood, Officer Jason Sawyer and
2 Officer Samuel Christ were patrolling the area near the intersection of Alemany Boulevard and
3 Ellsworth Street in a marked SFPD vehicle.  The officers have been employees of the SFPD for
4 sixteen, eleven and twelve years, respectively.  Through past experience, the officers knew the area
5 to be high in crime, including homicides and other crimes involving the use of weapons.  The
6 officers were specifically assigned to patrol the area because of recent incidents of violent crimes.
7 All of the officers wore marked uniforms.

8    As the officers approached the property on Alemany Boulevard in their vehicle, Sergeant
9 Greenwood, who occupied the right rear passenger seat, observed defendant standing in the shadows
10 adjacent to 845 Ellsworth Street, one of a group of buildings referred to, collectively, as the
11 Alemany housing project.  The building was illuminated by approximately six lights, and Sergeant
12 Greenwood, about fifty to sixty yards away, noted that defendant was standing against the building
13 with his arms crossed, clutching a package consistent in shape and size with a baseball bat or other
14 weapon.  Defendant was looking from side to side.  Sergeant Greenwood could not tell precisely
15 what the object was, but based on these observations, which included the time of night and the high-
16 crime area, he informed Officers Sawyer and Christ that he suspected that the object that defendant
17 was holding was possibly a weapon.  Sergeant Greenwood told the officers to drive into the housing
18 project in order to investigate defendant and determine whether he was indeed carrying a firearm.

19    The vehicle turned right on Ellsworth Street and proceeded up the hill, circling around to the
20 back of the building where defendant had been sighted.  Officer Christ, the driver, stopped to allow
21 Sergeant Greenwood to exit the vehicle.  Sergeant Greenwood noted that defendant had moved from
22 where Sergeant Greenwood had initially observed him.  Shortly afterwards, Officer Sawyer exited.
23 Then, Officer Christ exited.  Officer Christ encountered defendant walking between Ellsworth Street
24 and the buildings along a strip of grass bordered on the uphill and downhill sides by fences.  Officer
25 Christ and defendant were separated by the uphill fence.  Officer Christ observed defendant carrying
26 something while looking over his shoulder as he walked.  Officer Christ testified that he thought
27 defendant might be the suspect that Sergeant Greenwood had observed, so he ordered defendant to
28

2

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  stop.  Defendant looked at Officer Christ and replied, "I didn't do nothing."  Officer Christ testified
2  that he repeated his order, but that defendant proceeded to make his way through a hole in a
3  downhill fence, now separating himself from Officer Christ by two fences.  Defendant walked at a
4  brisk pace along the side of one of the buildings, down the hill and away from Officer Christ.
5  Defendant then rounded the corner and disappeared from Officer Christ's view.

6  Sergeant Greenwood, who was standing in the courtyard between 861 and 845 Ellsworth
7  looking for defendant, caught sight of defendant as defendant rounded the corner.  The two made
8  eye contact.  As Sergeant Greenwood ordered defendant to stop, defendant immediately ran away
9  while continuing to carry the package.  Sergeant Greenwood gave chase.  Officer Sawyer, who was
10  positioned between Greenwood and Christ, heard someone say, "he's running," and then observed
11  Sergeant Greenwood running after defendant, who was running down the hill towards Alemany
12  Boulevard.  Officer Sawyer (approximately fifteen feet behind Sergeant Greenwood) began to
13  pursue the defendant as well.

14  Sergeant Greenwood was between thirty to fifty yards behind defendant during the pursuit.
15  Sergeant Greenwood first lost sight of defendant when defendant rounded the corner of a building
16  along Alemany Boulevard.  Sergeant Greenwood then caught sight of defendant again.  As
17  defendant approached Folsom Street, he crossed over Alemany Boulevard.  Sergeant Greenwood
18  suspected that defendant either ran toward the freeway or was in the bushes separating Alemany
19  Boulevard from the freeway.  Sergeant Greenwood first turned his attention toward the freeway.
20  Not seeing defendant, Sergeant Greenwood believed defendant was concealed in the bush area.
21  Since defendant possibly had a weapon, Sergeant Greenwood drew his gun.  Also, he placed a call
22  requesting a canine unit through his radio, which appears on the dispatch logs at 10:42 and three
23  seconds.  Sergeant Greenwood illuminated the bushes with the flashlight affixed to his gun.  Officer
24  Sawyer also had his gun drawn and pointing at the bushes.

25  Officers Jay Dowke and Wendell Jones, who were responding to Sergeant Greenwood's call
26  for assistance, then arrived in their vehicle.  Officer Dowke, the driver, shined the spotlight affixed
27  to the vehicle toward the bushes that separate Alemany Boulevard from the freeway.  He saw
28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

3

1 defendant's face in the bushes and called out to the other officers that defendant was visible.
2 Defendant was facing the officers while he lay on his stomach.  Officer Dowke exited his vehicle,
3 pulled out his gun and ordered defendant to show his hands.

4     Officer Dowke then ordered defendant out of the bushes by gunpoint.  The testimony is in
5 conflict as to whether defendant complied by coming out or whether the officers had to pull him out.
6 When he emerged from the bushes, defendant was no longer holding his package.  Officer Dowke
7 covered defendant with his weapon so the arresting officers could handcuff defendant.  While
8 defendant was handcuffed, Officer Sawyer subjected defendant to a pat-down of his clothing and a
9 frisk for weapons.  The officers then observed the package, which was lying in the bushes where
10 defendant had been found. Sergeant Greenwood contacted the dispatcher to call off the canine unit,
11 which was logged at 10:42 p.m. and thirty-four seconds.  Officer Jones went to retrieve the package.
12 According to his own uncorroborated testimony, Officer Jones first drew his baton to carefully tap
13 the blanket.  He heard the sound of metal at one end, and wood at the other end.  Based on this
14 further evidence he believed that the bundle contained a rifle, he uncovered the butt of the rifle and
15 observed the wood.  He then carried it out of the bushes; when he picked the bundle up, he became
16 further convinced that it contained a rifle.  He unwrapped the green blanket to reveal a multi-colored
17 paisley fitted bedsheet.  Officer Jones then unwrapped this bedsheet to expose the rifle.  There was
18 no magazine but the bolt was closed.  After the rifle was recovered, Sergeant Greenwood informed
19 defendant he was under arrest for possession of the rifle.  At the SFPD station, Sergeant Greenwood
20 determined that there was an active no-bail arrest warrant for defendant.

21

22 DISCUSSION

23     The government concedes that the officers did not have probable cause to arrest defendant at
24 the time they searched the bundle for the gun.  Instead, the government contends that the officers
25 had reasonable suspicion to detain defendant and that the search was lawful pursuant to that
26 detention.  Defendant responds that the officers lacked reasonable suspicion, that the seizure of
27 defendant was an arrest, and that the search of the bundle went beyond what is permitted pursuant to
28

4

1  an investigatory stop or a search incident to an arrest.

2  I.        Reasonable Suspicion

3        "The touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S.
4  248, 250 (1991) (citing Katz v. United States, 389 U.S. 347, 360 (1967)). "The Fourth Amendment
5  prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief
6  investigatory stops of persons or vehicles that fall short of traditional arrest." United States v.
7  Arvizu, 534 U.S. 266, 273 (2002) (citing Terry v. Ohio, 392 U.S. 1 (1968); United States v. Cortez,
8  449 U.S. 411, 417 (1981)). If the police have reasonable suspicion that criminal activity "may be
9  afoot," then an investigatory stop does not violate the Fourth Amendment. See United States v.
10 Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 30); Cortez, 449 U.S. at 417. Courts
11 "must look at the 'totality of the circumstances' of each case to determine whether the detaining
12 officer has a 'particularized and objective basis' for suspecting legal wrongdoing." Arvizu, 534 U.S.
13 at 274 (citing Cortez, 449 at 417–18). "Although an officer's reliance on a mere 'hunch' is
14 insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for
15 probable cause, and it falls considerably short of satisfying a preponderance of the evidence
16 standard." Arvizu, 534 U.S. at 274 (citing Sokolow, 490 U.S. at 7).

17       Here, reasonable suspicion arose when Sergeant Greenwood first observed defendant
18 standing adjacent to one of the buildings. It was past ten o'clock in the evening, in an area known
19 for violent crimes. Defendant was clutching a package consistent in size and shape with a baseball
20 bat or other weapon and was looking from side to side. At this point, Sergeant Greenwood wished
21 to speak to defendant. Under the "totality of the circumstances," defendant's conduct was less
22 consistent with legal conduct and more consistent with illegal conduct. For example, it is not
23 consistent with someone traversing from one apartment to another or similar legitimate business, as
24 defendant contends. Thus, it raised a reasonable suspicion sufficient to permit investigatory
25 questioning.

26       Defendant's flight from the officers heightened their reason for the detention. See Illinois v.
27 Wardlow, 528 U.S. 119, 124 (2000). "Our cases have also recognized that nervous, evasive
28

UNITED STATES DISTRICT COURT
For the Northern District of California

behavior is a pertinent factor in determining reasonable suspicion." Id. (citing United States v. Brignoni-Ponce, 422 U.S. 873 (1975); Florida v. Rodriguez, 469 U.S. 1, 6 (1984) (per curiam); Sokolow, 490 U.S. at 8–9). "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." Wardlow, 528 U.S. at 125 (citing Cortez, 449 U.S. at 418). Officer Christ observed defendant looking back at him as defendant walked down the hill with his package. When Officer Christ ordered defendant to stop, defendant replied, "I didn't do nothing." After Officer Christ repeated his order, defendant walked briskly away. Sergeant Greenwood, in identifiable police uniform, asked defendant to stop, and defendant immediately ran away, ultimately hiding in the bushes.

Defendant argues that he did not have an obligation to speak to the police and was simply exercising his right to walk away. According to defendant, his flight in this case is distinguishable from that in Wardlow because it was provoked by police behavior. This argument is unavailing for two reasons. First, the police had reasonable suspicion that defendant was carrying a concealed weapon. Based on Sergeant Greenwood's initial observations, before the flight took place. Here, unlike in Wardlow, the officers based their suspicion on more than defendant's mere presence in a high-crime area. In addition, defendant was suspiciously located standing in the shadows adjacent to a building, was looking from side to side, and was holding a suspicious bundle. These factors, in combination, are enough to justify an investigatory stop.

Second, a request by the police to "stop," without more, does not provide reasonable justification for defendant's headlong flight and attempt to hide. The provocation in Wardlow—the simultaneous arrive of a "four-car caravan"—was arguably equally severe. See 528 U.S. at 124. The officers thus properly considered defendant's flight as one of the factors supporting an investigatory stop.

II.     Scope of Detention

Defendant further argues that the force used by the police in restraining him transformed the detention from an investigatory stop into an arrest.

6

"Police officers are entitled to employ reasonable methods to protect themselves and others in potentially dangerous situations." Allen v. City of Los Angeles, 66 F.3d 1052, 1056–57 (9th Cir. 1995) (citing United States v. Jacobs, 715 F.2d 1343, 1345–46 (9th Cir. 1983)). "Our cases have justified the use of force in making a stop if it occurs under circumstances justifying fear for an officer's personal safety." United States v. Willis, 431 F.3d 709, 717 (9th Cir. 2005) (citing Jacobs, 715 F.2d at 1345–46; United States v. Beck, 598 F.2d 497, 501 (9th Cir. 1979)). In Gallegos v. City of Los Angeles, 308 F.3d 987 (2002), the Ninth Circuit noted that, "[o]ur cases have made clear that an investigative detention does not automatically become an arrest when officers draw their guns." Id. at 991 (citing United States v. Buffington, 815 F.2d 1292, 1300 (9th Cir. 1987) (finding no arrest when defendants were forced from their car and made to lie down on the pavement at gunpoint)). Also, the Ninth Circuit noted that the use of handcuffs did not transform the detention into an arrest. See Gallegos, 308 F.3d at 991 (citing Allen, 66 F.3d at 1056–58 (finding no arrest when police ordered defendant to exit car and lie on the ground, and then handcuffed defendant with gun pointed at his head)); United States v. $109,179 in U.S. Currency, 228 F.3d 1080, 1085 n.15 (9th Cir. 2000), Halvorsen v. Baird, 146 F.3d 680, 685 (9th Cir. 1998); Alexander v. County of Los Angeles, 64 F.3d 1315, 1320 (9th Cir. 1995).

Here, possibly armed, defendant posed a threat to officer safety while in the bushes. Thus, it was reasonable for the police officers to point guns at the defendant as they asked defendant to get out of the bushes. Given that defendant had already run and appeared to have a weapon, it was reasonable for the police to handcuff defendant. The detention, which was also of relatively short duration, did not rise to the level of an arrest.

III.   Scope of Search

The final question the court must reach is what the police reasonably should have done with the package left lying in the bushes. Defendant argues that because the bundle was no longer in his reach, the police were required to obtain a warrant before opening it. According to defendant, the

7

fact that the package consisted of a bundle of blankets rather than a backpack or briefcase is irrelevant.

The court finds that the search of the bundle was reasonable, in light of the nature of the package and the surrounding circumstances. The police already had reason to believe the package contained a weapon. Tapping the bundle to determine its contents was not unreasonable. If the tap revealed an innocent possession, it could be returned to defendant and he could be released. The alternative suggested by defendant of getting a warrant would require either leaving an officer at the location and getting a warrant which could, at that time, have taken a substantial amount of time, or taking the package to the police station to get a warrant. Of course, in picking up the package to do that, it would have become apparent what it contained. This was not an enclosed case or backpack which upon picking it up would not reveal its contents. Thus, when Officer Jones picked up the bundle, which defendant concedes to be reasonable, the nature of the bundle's contents became apparent.

Contrary to defendant's contention that the police should have contacted a magistrate to obtain a warrant, based on the combination of the late hour, the strong suspicion that the bundle contained a weapon, and the fact that the contents of the bundle would inevitably become known upon further handling by the police, the court finds that confirming the contents without a warrant was reasonable. The combination of facts of this case are unique and include a highly suspicious package, culpable behavior on the part of defendant, and the dangerous surroundings. Under these facts, the actions of the police were reasonable.

8

CONCLUSION

For the foregoing reasons, the court hereby DENIES defendant's motion to suppress evidence.

IT IS SO ORDERED.

Dated: July 31, 2006

MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California